**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**



CLERK, U.S. DISTRICT COURT
RICHMOND, VA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.,*<br>STATE OF NORTH CAROLINA, *ex rel.,* AND<br>COMMONWEALTH OF VIRGINIA ex rel, | Civil Action No.: 3:15cv 245 |
| | |
| JACQUELYNE GRISWOLD<br>7465 Ambrose Drive<br>Mechanicsville, VA 23111 | **Complaint**<br>Filed Under Seal<br>Pursuant to<br>31 U.S.C. § 3730(b)(2) |
| DEBORAH OLEXY<br>894 Dogwood Dell Lane<br>Midlothian, VA 23113 | **Jury Trial Demanded** |
| JULIE WARREN<br>15606 Chesdin Point Drive<br>Chesterfield, VA 23838 | |
| BRINGING THIS ACTION ON BEHALF<br>OF THE UNITED STATES OF AMERICA AND<br>THE STATE OF NORTH CAROLINA AND<br>THE COMMONWEALTH OF VIRGINIA | |
| CIVIL-PROCESS CLERK<br>UNITED STATES ATTORNEY<br>600 East Main Street<br>Richmond, VA, 23219 | |
| ATTORNEY GENERAL OF<br>THE UNITED STATES<br>U.S. Department of Justice<br>950 Pennsylvania Ave, N.W.<br>Washington, DC 20530 | |
| ATTORNEY GENERAL FOR THE STATE OF<br>NORTH CAROLINA<br>9001 Mail Service Center<br>Raleigh, NC 27699 | |
| ATTORNEY GENERAL FOR THE<br>COMMONWEALTH OF VIRGINIA<br>900 East Main Street<br>Richmond, VA 23219 | |

v.                                          )
                                            )
HEARTLAND HOSPICE SERVICES, LLC             )
1504 Santa Rosa Road                        )
Suite 114                                   )
Richmond, VA 23229                          )
                                            )
HEARTLAND HOSPICE OF NEWPORT NEWS           )
11835 Fishing Point Drive, #202             )
Newport News, VA 23606                      )
                                            )
IN HOME HEALTH LLC,                         )
c/o CT CORPRATION SYSTEM                    )
4701 Cox Road, Suite 285                    )
Glenn Allen, VA 23060                       )
                                            )
HEARTLAND HOSPICE SERVICES, LLC             )
c/o CT CORPRATION SYSTEM                    )
4701 Cox Road, Suite 285                    )
Glenn Allen VA 23060                        )
                                            )
HCR MANORCARE MEDICAL SERVICES              )
OF FLORIDA, LLC.                            )
c/o CT CORPRATION SYSTEM                    )
4701 Cox Road, Suite 285                    )
Glenn Allen, VA 23060                       )
                                            )
MANORCARE HEALTH SERVICES-IMPERIAL )
1719 Bellevue Ave                           )
Richmond, VA 23277                          )
                                            )
HCR MANORCARE                               )
333 N. Summit Street                        )
Toledo, OH 43699                            )
                                            )
CARLYLE GROUP                               )
1001 Pennsylvania Avenue, NW                )
Washington, DC 20004                        )
                                            )
ELM CROFT OF CHESTERFIELD                   )
1000 Twinridge Lane                         )
Richmond, VA 23235                          )
                                            )
ELM CROFT                                   )
9510 Ormsby Station Road                    )
Louisville, KY 40223                        )

2

|                                    |     |
|------------------------------------|-----|
| ENVOY OF STRATFORD HILLS           | )   |
| 7246 Forest Hill Avenue            | )   |
| Richmond, VA 23226                 | )   |
|                                    | )   |
| CONSULATE HEALTH CARE, LLC         | )   |
| 800 Concourse Parkway              | )   |
| S. Suite 200 Maitland, FL 32751    | )   |
|                                    | )   |
| DEFENDANTS.                        | )   |

## COMPLAINT

This is an action filed under the *qui tam* provisions of the Federal False Claims Act, 31

U.S.C. Sec. 3729, *et seq.*, the North Carolina False Claims Act N.C. Gen. Stat. §§1-605 *et*

*seq.*, and the Virginia Fraud Against Taxpayers Act VA. Code Ann. §§8.01-216.1 *et seq.*

by Plaintiff-Relators Jacquelyne Griswold, Deborah Olexy and Julie Warren, in the name

of the United States, North Carolina, Virginia and themselves to recover penalties and

damages arising from illegal activities conducted by the Defendants. The Defendants

defrauded the United States, North Carolina and Virginia through the illegal admission of

patients to hospice and home health care and regular abuse of the admission and billing

procedures for those services, including the use of kickbacks and falsified documentation

to obtain funds through false claims submitted to government programs.

## JURISDICTION AND VENUE

      1.    This action arises under the Federal False Claims Act, 31 U.S.C. §§ 3729,

*et seq.* (2012) (the "False Claims Act").

      2.    Plaintiff-Relator also brings this action on behalf of the government of

North Carolina for the Defendants' violations of N.C. Gen. Stat. §§1-605 *et seq.*, and the

government of Virginia for violations of VA. Code Ann. §§8.01-216.1 *et seq.*

3

3.     The False Claims Act confers national jurisdiction on the district courts. This Court maintains subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331, and supplemental and pendant jurisdiction over the state law claims herein.

4.     This Court has jurisdiction over the North Carolina False Claims Act and Virginia Fraud Against the Taxpayers Act claims under 31 U.S.C. § 3732(b) in that the transactions and or occurrences described herein, which violate the North Carolina and Virginia laws involve a common nucleus of facts as, and are related to, those that violate the Federal False Claims Act.

5.     Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) because the Defendants regularly transact business in this District and did so at all times relevant to this Complaint.  Furthermore, many of the facts proffered in support of these allegations took place within this District. In addition, at least one Defendant has offices in this District.

6.     There has been no public disclosure of the allegations contained in this Complaint.

7.     Plaintiff-Relators Jacquelyne Griswold, Deborah Olexy and Julie Warren are each an original source of all information contained in this Complaint within the meaning of 31 U.S.C. § 3730(e)(4)(B) as well as North Carolina and Virginia law. Ms. Griswold, Ms. Olexy and Ms. Warren each have direct and independent knowledge of the information contained herein. They voluntarily served a copy of a disclosure statement and substantially all of the information and documents on which the Plaintiff-Relators base their allegations on the governments of the State of North Carolina, the

4

Commonwealth of Virginia and the United States pursuant to 31 U.S.C. § 3729(2)(b), 31 U.S.C. § 3730(e)(4), and related provisions of the North Carolina False Claims Act and the Virginia Fraud Against Taxpayers Act prior to filing this civil action.

## PARTIES INVOLVED

8.     The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

9.     Plaintiff-Relators Jacquelyne Griswold, Deborah Paul Olexy, and Julie Warren are each nurses with many years of experience in the field of hospice and home care. They met while working in Defendant Heartland's Richmond, Virginia office and providing hospice care. All three Plaintiff-Relators have experience providing hospice care through the Richmond, Virginia Heartland office. After observing Heartland's practices first-hand, the three Plaintiff-Relators each independently came to the conclusion that Heartland's policies and decisions were dictated by a concern for maximizing profits at the expense of quality of care and concern for patients.

10.     Plaintiff-Relator Jacquelyne Griswold worked for Heartland in Newport News, Virginia in 2009-2010 and in Richmond from 2011 through 2013.

11.     Plaintiff-Relator Julie Warren worked at the Heartland Richmond office from May 2012 to November 2013.

12.     Plaintiff-Relator Deborah Olexy worked for Heartland in Raleigh, North Carolina as Branch Administrator for home health care from November 2012 to February 2013. From there, she transferred to the Richmond, Virginia office and served as a Case Manager and Team Leader for hospice care. During the the majority of the time she was

employed by Heartland, she was known as Deb Jones. Through marriage, her surname is now Olexy. She also previously worked for the company in Houston, Texas.

13. Defendant Heartland Hospice Services, LLC ("Heartland") 1504 Santa Rosa Road, Suite 114, Richmond, VA 23229 is a hospice provider serving Richmond and the surrounding area.

14. Defendant Heartland of Newport News has offices at 11835 Fishing Point Drive, #202, Newport News, VA 23606.

15. Defendant Heartland had home care offices at 4505 Falls of Neuse Road, Suite 650, Raleigh, NC 27609.

16. Defendant Heartland lists several entities as part of "Heartland" in public advertising information including: In Home Health, LLC; Heartland Hospice Services, LLC; HCR Manor Care Services of Florida, Inc.; HCR ManorCare Services of Florida II, Inc.; HCR Manor Care Services of Florida III, Inc. All Heartland Defendants hereinafter referred to collectively as "Heartland" and are "part of the HCR ManorCare family," according to website information. The company delivers hospice care, home care, skilled nursing memory care, and post-acute care in 25 states.

17. Defendant ManorCare Health Services-Imperial is located at 1719 Bellevue Ave, Richmond VA. HCR ManorCare also owns this facility.

18. The parent company of Heartland, HCR ManorCare is a privately held company since 2007 and has more than 55,000 employees in the United States according to its website. The company maintains headquarters at 333 N. Summit Street, Toledo, Ohio 43699. According to the HCR ManorCare corporate website the company was

6

purchased by the Carlyle Group in December of 2007 and at that time ceased trading or issuing stock.

19. Defendant the Carlyle Group of 1001 Pennsylvania Avenue, NW Washington, DC 20004 is a publically traded partnership on the NASDAQ exchange that describes itself as a global alternative asset manager. It owns HCR ManorCare.

20. Defendant Elm Croft of Chesterfield ("Elm Croft") is an assisted living facility located at 1000 Twinridge Lane Richmond, Virginia 23235. It is part of the Elm Croft organization which has 102 senior care communities, including 79 assisted living communities, four multilevel retirement communities, and 19 health and rehabilitation centers serving over 6,000 residents in 19 states. The company has headquarters at 9510 Ormsby Station Road, Louisville, KT, 40223.

21. Defendant Envoy of Stratford Hills is located at 7246 Forest Hill Avenue, Richmond, VA 23226 and is an assisted living facility with 196 beds. It is owned by Consulate Health Care, LLC of 800 Concourse Parkway, S. Suite 200 Maitland, FL 32751.

## FACTUAL ALLEGATIONS

### 1. Summary of fraudulent activity conducted by Heartland and related Defendants.

22. The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

23. Each of the three Plaintiff-Relators has worked as a hospice nurse for Heartland. Relator Olexy also worked for Heartland as a home health care services administrator.

7

24.     Through their experiences, each Plaintiff-Relator learned that marketing concerns and profits motivated Heartland's decisions, often at the expense of quality of patient care.

25.     Heartland's standard practice was to admit patients for services for which they did not qualify. CMS regulations require patients to meet certain criteria in order to qualify for home health care or hospice services.

26.     For example, Alzheimer's patients generally must not be ambulatory in order to qualify for hospice care under CMS regulations. Despite that requirement, Heartland would regularly admit ambulatory Alzheimer's patients and order nursing staff to falsify their observations thereof.

27.     Furthermore, Heartland would admit patients to home health care without a plan of care and keep them admitted without face-to-face documentation.  Such documentation was routinely falsified. Face-to-face documents were filled out by non-medical personnel and signed prior to any meeting with the patient. Documents were also signed by doctors who had no responsibility for the home healthcare patient.

28.     Heartland patients were also admitted to hospice through the use of a kickback scheme.

29.     The kickbacks did not involve cash. Instead, Heartland officials would provide free labor to healthcare institutions that needed additional care for patients that were ill but did not yet qualify for hospice care. Grateful nurses who were charged with caring for patients at those facilities accepted the labor and in exchange referred patients to Heartland for hospice care once they were too sick for normal care.

8

30.     As a result of false admissions to hospice care and home health care, medical services were provided to patients who were ineligible for such services.

31.     Patients received durable medical equipment and were hospitalized for inpatient care as hospice patients. Such wrongful admissions and false documentation led to increased payments under the Medicare and Medicaid programs.

32.     The patients were admitted and retained for such services in large part because marketing and administrative staff received bonuses based upon the number of cases referred to hospice and home health care.

33.     The bonuses created incentives to admit and retain patients who should not have been admitted. As a result, patients regularly received unnecessary and in some cases, harmful, services.

34.     The aforementioned staff who receive bonuses pressured the Plaintiff-Relators to falsely document, admit, and retain unqualified patients at all times.

35.     There is a significant difference between the medical issues prevalent in many elderly patients and the serious issues that qualify a patient for home health care and/or those issues so devastating that they necessitate palliative hospice care.

36.     Those differences are defined by CMS regulations, but, essentially, the severity of illness dictates the appropriate treatment for a patient.

37.     For example, only patients that are within six months of death qualify for hospice care. Heartland's pattern and practice was to ignore the aforementioned regulations in order to maximize profits, thereby harming patients.

38.     The worst consequence of Heartland's practices was the denial of needed curative care to patients who were wrongly admitted to hospice care.

9

39. Hospice care, by definition, does not include curative care. Patients are administered only medicines that lessen suffering. Accordingly, any unqualified patients that were admitted to hospice care necessarily suffered harm as a result of Heartland's business decisions because they failed to receive the curative care that was necessary to improve their medical conditions.

40. All three Plaintiff-Relators found that Heartland admitted and retained patients who were not eligible and should not have been eligible for hospice care. They encountered patients who could not possibly have met the standards for hospice.

41. The Plaintiff-Relators encountered evidence of, but not limited to, the following illegal practices conducted on a widespread multiple-facility basis by Heartland:

a. Admitting and keeping patients for hospice care who did not meet eligibility requirements;

b. Recertifying hospice patients who do not meet eligibility requirements;

c. Knowingly using falsified nursing documents to maintain patient services for hospice care. This included wrongfully obtaining services such as hospitalization and material such as durable medical equipment for inpatient hospice care;

d. Obtaining from physicians Home Health Care face-to-face encounter documents, which did not meet certification and plan of care requirements;

e. Having Heartland employees, including marketing staff, fill out face-to-face encounter documents rather than physicians or the physicians agents doing so;

f. Providing services for patients in nursing facilities over and above normal practices as illegal kickbacks to obtain patient referrals;

g. Providing certain services such as physical therapy to patients who should have been put on Hospice and therefore would not have been in need of or eligible for such services;

h. Putting pressure on nurses to change or falsify the patient's true condition, and

10

i. "Up coding" charges for home health care patients.

**2. Defendants' Hospice care practices creating false claims.**

**A. False admission and retention of patients through Heartland's Richmond, Newport News, Virginia and other offices.**

42.     The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

43.     Under Medicare, hospice care is available to terminally ill individuals for two initial 90-day periods, and then for an unlimited number of 60-day periods, as long as certain conditions are met. *See, e.g.*, Medicare Benefit Policy Manual Ch. 9 §§ 10, 20.1.

44.     In order to be eligible to elect hospice care under Medicare, an individual must be entitled to Part A of Medicare and also be certified as terminally ill in accordance with 42 C.F.R § 418.22. *See also* 42 U.S.C. § 1395 f (7)(A); 42 C.F.R § 418.20.

45.     According to 42 C.F.R § 418.3, "terminally ill" is defined as a person who "has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course." Generally, in order to be eligible for hospice care under Medicaid, an individual must be determined to be eligible for Medicaid and certified as terminally ill under the same standards as under Medicare.

46.     In the Plaintiff-Realtors' experience, Heartland admitted and retained patients in hospice care who simply did not qualify for such care. The company provided numerous materials to help nurses determine how to admit patients.  These documents include a booklet called the "Heartland Hospice Admission Guidebook," which provides information about how to admit a patient to such care.

47. The Guidebook includes references to exactly the kind of medical charts and requirements expected of a hospice provider. The Guidebook makes clear that a nurse or RN conducts an initial assessment, which "identifies the patient's eligibility for hospice care and services and is an evaluation of the patient's physical, psychosocial, emotional and spiritual status related to the terminal illness." *See* Heartland Hospice Admission Guidebook, page 11.

48. The Guidebook also notes that, "A thorough initial assessment supports eligibility and stands as a baseline for future determination of ongoing eligibility and a reference for patient decline." The Guidebook directs the use of Karnofsky palliative Performance Scale (PPS), Functional Assessment Staging Tool (FAST) New York Heart/Assessment (NYHA), Basal Metabolic Index, and other scales to provide additional supporting data. The Guidebook notes that Local Coverage Determinations (LCD's) are tools to use as a guide for determination of eligibility and are used by the fiscal intermediary when determining payment. See Heartland Hospice Admission Guidebook, page 11.

49. The Plaintiff-Relators were all directed to document patients who were not within six months of death as if they met the requirement, which they did not. Each Plaintiff-Relation refused to alter her observations.

50. One common example of these practices involved patients who suffer from Alzheimer's disease. Such a patient, generally, must also not be ambulatory to qualify for hospice care. An Alzheimer's diagnosis requires relatively more serious additional conditions to qualify for hospice care than a physical disease such as cancer

because a patient can survive for a long period of time when they suffer from Alzheimer's disease, despite his or her mental decline.

51. The progression of Alzeheimer's is slow Therefore, the general requirement that a patient have a life expectancy of six months or less is usually not met on an initial diagnosis of Alzheimer's.

52. Indeed, the Local Coverage Determination Hospice Determining Terminal Status (L32015) states:

Section II: Non-Cancer Diagnosis

**B. Dementia due to Alzheimer's Disease and Related Disorders**
Patients will be considered to be in the terminal stage of dementia (life expectancy of six months or less) if they meet the following criteria. Patients with dementia should show all the following characteristics:

1. Stage seven or beyond according to the Functional Assessment Staging Scale;
2. Unable to ambulate without assistance;
3. Unable to dress without assistance;
4. Unable to bathe without assistance;
5. Urinary and fecal incontinence, intermittent or constant;
6. No consistently meaningful verbal communication: stereotypical phrases only or the ability to speak is limited to six or fewer intelligible words.

Patients should have had one of the following within the past 12 months:
1. Aspiration pneumonia;
2. Pyelonephritis or other upper urinary tract infection;
3. Septicemia;
4. Decubitus ulcers, multiple, stage 3-4;
5. Fever, recurrent after antibiotics;
6. Inability to maintain sufficient fluid and calorie intake with 10% weight loss during the previous six months or serum albumin <2.5 gm/dl.

Note: This section is specific for Alzheimer's Disease and related disorders, and is not appropriate for other types of dementia, such as multi-infarct dementia.

Local Coverage Determination (L32015) for Hospice care and Alzheimer's disease.

53.     It is clear to the Plaintiff-Relators that a patient with an Alzheimer's disease diagnosis should not qualify for hospice care if the patient was in fact ambulatory and has no other serious condition or disease that independently qualifies the patient for hospice.

54.     This was also clear to the Heartland managers. They therefore put pressure on the Plaintiff-Relators not to document ambulatory Alzheimer's patients as such. The marketers and management knew that such documentation would make it difficult to admit a patient and keep a patient on the service. The Defendants pressured the Plaintiff-Relators to label such patients as "not being ambulatory."

55.     That finding would make it easier to justify admittance for Alzheimer's patients to hospice care and keep them on hospice care. Specifically, the Relators were told by mangers that they could say that somebody was not ambulatory *because* the patient had Alzheimer's disease and that being ambulatory had something to do with cognition.

56.     Plaintiff-Relator Griswold specifically objected to management about this rationale and noted that being physically ambulatory had nothing to do with cognition itself. All the Plaintiff-Relators had their observations overruled by management when they did not agree to admit a hospice patient.

57.     Alzheimer's diagnoses were not the only kind of case about which the Plaintiff-Relators and management disagreed about admission criteria. In fact, the Plaintiff-Relators often diagnosed patients as inadmissible to hospice and management took action to admit patients despite the findings of these nurses.

58.     Heartland put managers on a bonus system that created incentives for managers to put pressure on the professionals to admit and recertify patients into hospice care. Administrator Marroletti and Regional Director Daignault were both compensated with this sort of bonus plan.

59.     Bonuses were based on revenue and the number of patients in the hospice care. They created an incentive for the staff to admit patients to hospice care whether or not such care was appropriate.

60.     As a result, the administrators put undue pressure on nurses to admit patients. For example, Heartland assigned Janelle Stanley, a regional hospice consultant to go on patient visits with Ms. Olexy after she failed to comply with management's directives to falsify patient observations.

61.     In Ms. Olexy's presence, Ms. Stanley invented conditions to justify care. Relator Olexy was also told by Kevin Daignault, the Regional Director of Operations for Virginia, "you will admit who we tell you."

62.     When Plaintiff-Relator Warren would not admit a patient pursuant to appropriate criteria for hospice care, the administrators sent out another nurse to review the case so that the patient would be admitted.

63.     Generally, the administrators would send Nurse Whitney Braxton to meet the patient shortly after Plaintiff-Relator Warren and she would admit the patient to hospice.

64.     Ms. Braxton had a reputation for admitting anyone she was asked to admit. Plaintiff-Relator Warren also observed an instance when Ms. Braxton filled out visit paperwork, but had not actually visited the patient, which the patient's family

15

noticed. Nonetheless, Ms. Braxton was assigned to admit additional patients to hospice care and was sent out to contradict Ms. Warren's assessments.

65.     When Plaintiff-Relator Griswold would decline to admit a patient, Richmond Administrator Lynda Marroletti or Stella Feldman, the Director of Professional Services, would generally assign Nurse Jonathan O'Brien to admit the patient into hospice care.

66.     When Debora Olexy moved to Richmond, Virginia she became a hospice Case Manager. Ms. Olexy was told by Administrator Marroletti not to document any patient making progress toward recovery.

67.     This directive was continually reinforced by Director Feldman, who mandated that the nurses document progression toward end of life, even in circumstances where patients were showing signs of recovery. Any progression toward good health would have made the continuing certification of hospice care easily falsifiable and therefore difficult to maintain. Director Feldman reviewed all nurse's patient notes.

68.     The Defendants also had a pecuniary interest in suppressing documentation of recovery.

69.     Patients who display signs of recovery are generally ineligible for hospice care. Therefore, improving patients are transferred to hospitals and other settings where they can receive treatment unavailable at Heartland facilities. Heartland falsified records in order to maintain what they viewed as revenue streams – sick patients.

70.     To that end, Relator Olexy was asked into the office and taught how to document improving patients in a manner that suggested they were actually progressing towards death. The Plaintiff-Relators were instructed not to document improvements in

16

patient health. Documenting decline was what Heartland dictated even if the patient was not an appropriate recipient of hospice care.

71. Each of the Plaintiff-Relators received continual pressure from Heartland management to document decline, admit ambulatory Alzheimer's patients and generally admit patients against their judgment. Such interference with nurses documenting their observations, attempts to find other documents, and rewriting documents for admission is not only wrong, it creates false records regarding a claim for payment as well.

72. Each Plaintiff-Relator has specific cases they remember vividly because they learned of patients who were admitted against their observations – patients who were denied needed medical care as a result of Defendants' greed.

73. They found information on one hospice patient who received Bowel surgery at least two months after admission to hospice. As such, he should have been ineligible for Bowel surgery under CMS regulations. Furthermore, in the Plaintiff-Relators' training and experience, such a procedure would generally kill a hospice patient who truly was within six months of death.

74. To be eligible for Bowel surgery, this patient had to have been removed or discharged from hospice care. Later documentation shows that he was returned to hospice care after the surgery. As of June 2013, his medical problems are plentiful, but the notes to his case also state:

"No longer doing yardwork x 3mo…"
"Pt. continues to care for self-going out to restaurants to eat…"

75. The documentation indicates the patient was able to go out to restaurants to eat five months after being admitted to hospice and three months after an operation,

17

which, if the initial admission to hospice care had been legitimate, would have killed the patient. The same patient received recertification after that time as well.

76.     In his case, the patient was lucky to have the needed operation. Some patients were improperly placed on hospice care and never discharged to curative care, making them ineligible for lifesaving medicines and procedures.

77.     Both Plaintiff-Relator Julie Warren and Jacquelyne Griswold met a patient who was still alive in January of 2015 after being admitted to Hospice in 2013. Neither Warren nor Griswold thought the patient should have been eligible for hospice originally in 2013.

78.     The Plaintiff-Relators also learned about a patient who was prescribed pain medication solely so he could be put on hospice care. The narcotic pain medication helped to justify the hospice care, but the patient was not in severe pain and did not need a heavy narcotic.

79.     The practice of wrongfully admitting patients on the basis of false documentation and falsely stated patient conditions was also specifically an issue for Relator Jacquelyne Griswold during her tenure at Newport News, Virginia and to the best of her knowledge continues at Heartland's facility there.

**B. Kickbacks paid for hospice referrals in the form of free labor.**

80.     The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

81.     In addition to falsely documenting, admitting, and retaining hospice patients, the Relators also discovered schemes through the Richmond, Virginia Heartland office by which Heartland paid kickbacks for referrals to hospice care.

18

82.     Any such action is a violation of the Anti-Kickback Statute ("AKS"). The AKS specifically prohibits the giving of any inducement to obtain referrals and the acceptance of any inducement in exchange for such referrals. Such a violation of the AKS also creates a false claim under the False Claims Act. *See* 42 U.S. Code § 1320a–7b *et. seq*. The AKS makes clear that any such illegal remuneration can be "in cash or in kind." 42 U.S. Code § 1320a–7b(b)(1)-(2).

83.     The scheme used by Heartland in Richmond, Virginia to obtain patient referrals provided illegal remuneration and an inducement in the form of free labor. Heartland provided a free nurse's aide to Envoy and Imperial Plaza nursing homes in exchange for referrals to Heartland for hospice care.

84.     The nursing homes profited from the free labor and Heartland knew the relatively cheap investment was well worth the regular stream of elderly patients who, like most nursing home residents, eventually needed hospice care.

85.     Envoy and Imperial did not have to hire additional staff to obtain additional bathing services or assign current staff to provide such services for their patients. Both Envoy and Imperial Plaza's nurses were grateful for the aid the Richmond Heartland office arranged for their patients.

86.     Those nurses would then refer potential hospice cases back to Heartland. Administrator Morraletti preserved these relationships and made sure that they created additional referrals for the Richmond hospice office.

87.     Both Imperial Plaza and Envoy would only suggest Heartland for hospice care services providing no alternative suggestions to their patients.

19

88.     In addition to accepting additional services for referrals, the Elm Croft facility in Richmond, Virginia was given an additional inducement to refer patients to Heartland. Elm Croft not only accepted additional services from Heartland for referrals, but also evaded requirements to discharge some of the patients in their care by having Heartland admit those patients into additional hospice care.

89.     Elm Croft is an assisted living facility. It is not a skilled nursing facility. Certain diagnoses are not appropriate for such a facility. If, for example, a patient develops incontinence, the patient is generally supposed to be transferred to a higher skilled care facility.

90.     However, if the patient is admitted to hospice care that patient can receive additional care at Elm Croft rather than be transferred and Elm Croft retains the patient to bill for its services.

91.     To refer a patient for hospice legitimately, the staff at Elm Croft is also supposed to provide more than one recommendation of a hospice provider.

92.     Elm Croft would only work with Heartland providing a referral source to Heartland so that Heartland would admit the patient on hospice care and keep the patient in Elm Croft for Elm Croft's benefit.

**3. Home Health care services practices that created false claims.**

**A. Home health care documentation obtained or created falsely.**

93.     The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

94.     Relator Olexy was the Director of Home Health in Raleigh, North Carolina and found many issues regarding wrongful admission and re-certification dating from before she worked there.

95.     Plaintiff-Relator Olexy not only believes the issues she discovered pre-dated her work in Raleigh, she has evidence that such wrongful admissions and certifications were routine in at least two other Heartland facilities. The marketing staff in Raleigh, like the marketing staff in Richmond, was paid on a bonus system for both hospice and home health care admissions.

96.     In North Carolina, part of Plaintiff-Relator Deborah Olexy's job included participation on a conference call every morning to determine why people did not get admitted to home health care. Each order to admit was worth thousands, potentially hundreds of thousands, of dollars to the company so there was a great deal of pressure to admit such patients.

97.     There was constant pressure to admit more patients. Deb Arendale, the Regional Vice President, and Susan Keitt regularly were on such calls with Plaintiff-Relator Olexy.

98.     Plaintiff-Relator Olexy discovered that pressure to admit patients reached the marketing department and as a result they engaged in wrongful activity to admit patients as well.

99.     For example, marketing staff would obtain admission signatures from the hospice care doctor who was not the doctor supervising the service for these patients.

100.    It is also clear from her experience that the Raleigh, North Carolina office was engaged in similar practices as the Richmond, Virginia office with regard to

21

wrongful admission of patients to hospice care. Indeed, she also reported to management that, "marketing staff had been writing orders for palliative care." Statement of "Deb Jones" Olexy signed February 25, 2013.

101.    Plaintiff-Relator Olexy's direct concern was the wrongful admission and retention of patients into the home health care program. She protested these actions vigorously.  Plaintiff-Relator Olexy noted that Dr. Marsh, the Director of Hospice Care, had no involvement in home health care case conferences.

102.    Therefore, Heartland should not have been asking him to sign forms to certify admission for home health care. Indeed, the form itself makes such a certification by Dr. Marsh false on its face.

103.    Form 485, which is the form used to certify initial eligibility has blocks for the attending physician to sign includes the following statement:

> I certify/recertify that this patient is confined to his/her home and needs intermittent skilled nursing care, physical therapy and/or speech therapy or continues to need occupational therapy. The patient is under my care, and I have authorized the services on this plan of care and will periodically review the plan.

> Anyone who misrepresents, falsifies, or conceals essential information required for payment of Federal funds may be subject to fine, imprisonment, or civil penalty under applicable Federal laws.

Form 485 and CMS instructions. Note blocks 26 and 28 appear next to the Attending Physician's signature block.

104.    Dr. Marsh, as the hospice care Medical Director, had no involvement with home health care patients.

105. The patients were not under Dr. Marsh's care. When Heartland's marketing staff could not get an appropriate doctor to sign admittance to home care they would have Dr. Marsh sign such a form.

106. Dr. Marsh's signature on the form did not justify admission to home health care and, more importantly, Heartland management knew this and was required to know it based on regulations.

107. Dr. Marsh was not a doctor who actually cared for the home health care patient or would be caring for the patient in the future. He was not in a position to sign off on a plan of care as required. Marketing people directed him to sign and he was paid for doing so.

108. Home health care admission also requires a certification that a face-to-face examination within 90 days (60 days prior to admission or 30 days after admission) has been conducted by a medical professional. That document is also supposed to be certified by a physician.

109. Plaintiff-Relator Olexy discovered Pam Poole, who was not a nurse but was employed by Heartland as marketing official, was writing face-to-face documents for the facility.

110. In her email to Susan Keitt Regional Director of Operations Plaintiff-Relator Olexy wrote:

> Susan again yesterday we received f2f FILLED OUT ENTIRELY BY Pam Poole...it was found by Sandy, Taken to Debbi Tant and then to me.
> I hate to use these words BUT this is illegal.
> I gingerly talked to Nikki and she has made this a high priority to get this practice stopped. Again as time moves forward I have quite concern over referrals that are not obtained properly in which I wish to discuss with you and give you examples I have come upon and those given to me by my team.
> Thanks Deb

23

Email correspondence of Deb Olexy January 08, 2013.

111.    Ms. Poole was also apparently signing admission forms. In addition, one marketing person who went to facilities in Durham, North Carolina for referrals (administered out of the Raleigh, North Carolina Heartland office) was using forms, which she had copied to create initial admissions to home health care. Ginny Fowler had them filled out as stating "PT for weakness" presumably standing for physical therapy repeatedly.

112.    When Plaintiff-Relator Olexy raised the issue with Deb Arendale, the Regional Vice President told Ms. Olexy to pick her battles. While it may be acceptable in some instances to fill out forms ahead of time, this stack of forms also appeared to be signed by the doctor ahead of time with the same diagnosis on each, precluding an actual review by the doctor.

113.    The diagnosis itself did not justify admission to home health care.

114.    The regulations regarding certifying an admission for home health care do allow for a face-to-face document to be certified by a doctor when a non-physician performs such an encounter.

115.    However, the regulations clearly require a medical professional to conduct the encounter as a condition of payment:

> ... The face-to-face encounter must be performed by the certifying physician himself or herself, by a nurse practitioner, a clinical nurse specialist (as those terms are defined in section 1861(aa)(5) of the Act) who is working in collaboration with the physician in accordance with State law, a certified nurse midwife (as defined in section 1861(gg) of the Act) as authorized by State law, a physician assistant (as defined in section 1861(aa)(5) of the Act) under the supervision of the physician, or, for patients admitted to home health immediately after an acute or post-acute stay, the physician who cared for the patient in an acute or post-acute facility and who has privileges at the facility.

24

42 C.F.R. 424.22(a)(v).

116.    Ms. Olexy was concerned that the fact that the documents were simply copied with a signature already on them indicated that no face-to-face examination of any kind took place.

117.    She was worried that marketing staff was attempting to have doctors certify to an examination that did not take place.

118.    Full certification of an admission for home health care requires a plan of care for which a doctor is responsible, as well as the face-to-face encounter.

119.    This puts the physician in the position of having responsibility for the ongoing care of the patient.

120.    Therefore, most physicians will not lightly sign such documentation. Heartland was having difficulty obtaining the required signatures for such admission and retention of patients.

121.    As a result of Deb Olexy's protests, Heartland's Carole Holzhauer came to the Raleigh, North Carolina office and provided compliance training. It was appropriate training and an appropriate response, but ultimately had no lasting effect on marketing staff.

122.    The incentives for the marketing staff to admit patients simply overwhelmed appropriate practice.

123.    Thereafter, Plaintiff-Relator Olexy also filed a statement with Heartland Corporate Compliance on February 25, 2013.

124.    Her statement included complaining that Dr. Marsh, the Medical Director of Hospice care, had been signing Form(s) 485 to certify admission for Home Care.

125.    Plaintiff-Relator Olexy pointed out that this was not appropriate, because attending physicians are supposed to sign such documentation. Dr. Marsh was serving as the Hospice Medical Director and in that position, he could not be responsible for the required plan of care and for following the patient admitted to home health care.

126.    Dr. Marsh did not treat patients in home health care and therefore could not legitimately sign a home health care plan of care for admission. Having him sign such documents created falsified admissions.

127.    Plaintiff-Relator Olexy refused to sign invoices on this basis. She also insisted that a physician sign required face-to-face documentation and that led to many such forms not being signed at all since Heartland could not obtain appropriate signatures on face-to-face forms.

128.    Ms. Olexy learned that Heartland did in fact retract some, but not nearly all, of the admissions, which were conducted by having Dr. Marsh sign the initial certification.

129.    Ms. Olexy's information is that Heartland returned some $240,000 of wrongful charges reflecting a three-month period of care. Heartland apparently dealt with some sub-set of the cases in which Dr. Marsh signed the initial certification to admit a patient.

130.    Heartland did not refund all such cases nor did they return cases regarding the falsified face-to-face documents, Dr. Marsh himself resigned.

131.    Plaintiff-Relator Olexy's experience was that the practice of wrongfully admitting people to home health care was so pervasive that in effect a return of such few

claims constitutes an extended cover-up of what Heartland was doing. Heartland had and knew it had many more wrongful claims in the Raleigh office.

132.    Some of the failure to document did cost Heartland financially. In home health care it is possible to bill for 60% of the service upon admission, but to bill the remaining 40% after an appropriate face-to-face documentation.

133.    Heartland faced difficulties with obtaining these signatures and had to return some of the money they had wrongfully obtained through Dr. Marsh's signature on admittance forms.

**B. Defendants "Up coding" of home health care cases to increase charges.**

134.    The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

135.    In addition to the wrongful admissions to home health care and the wrongful retention on home health care, Plaintiff-Relator Olexy found that there was significant pressure on employees to "up code" charges billed for the care provided.

136.    There was pressure to change the clinicians coding of care so as to be sure to bill more to insurance including government programs such as Medicare and Medicaid.

137.    Heartland provided no formal training for such coding. The Director of Patient Care Nursing in Raleigh, North Carolina had to do all the coding based on the information provided in the file by the clinician.

138.    Then she would have a call with a corporate officer to go over the codes used to bill insurance including government programs. Carole Holzhauer, Corporate

Clinical Director for Heartland, was generally the person who called into the Raleigh, North Carolina office.

139.    During this regular call the corporate officer would attempt to discuss the file on each patient without reviewing the file itself and convince the director of nursing to change the bill to a more favorable code or sequence in order to increase the charges to insurers.

140.    The sequence of the treatment was often changed resulting in up coding of charges. Every effort was made to convince the Patient Director of Care to raise the code level of complexity in order to charge more for the case. These changes were made without any contact to the clinician who administered the care to confirm if indeed such a change was appropriate.

141.    Every week somebody from Heartland's corporate office would review what the staff was putting down and reviewing the sequence of diagnosis. Then they would attempt to persuade the Raleigh, North Carolina staff to up code the bill.

142.    Plaintiff-Relator Olexy had to handle this call for her Director of Nursing on a couple of occasions and refused to change any such coding. However, the pressure to up code all charges never abated.

143.    In the end, Heartland abandoned providing home health care through its Raleigh, North Carolina Office.

144.    The Relators have case files providing evidence of more than 20 examples of patients receiving home health care substantiated through the use of faulty face-to-face encounter documents.

28

145.    The cases involve documents signed by business employees who were not medical staff at the direction of Heartland employees including but not limited to Jenny Fowler.

146.    These documents were either signed on behalf of a physician signed or the physician signed the document in blank prior to any information being entered on the form.

147.    No actual "face-to-face" examination was conducted and therefore each of these admissions for home health care is fraudulent pursuant to a false document, which can not substantiate medical necessity for home health care.

148.    In addition, the Plaintiff-Relators discovered "face-to-face" encounter documents completed by HCR Manor Care employees who were not physicians or agents of the physicians. While the physician signed the document no physician had conducted a face-to-face as required, but merely signed a document prepared by Pam Poole of Heartland. Again the home health care was provided based upon fraud.

**4. Nationwide efforts to admit patients and charge for patients who did not qualify**

149.    The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

150.    The Plaintiff-Relators have reason to believe many of the practices described above extend to virtually all Heartland offices. This evidence goes beyond their direct experience implicating Richmond and Newport News, Virginia and, Raleigh North Carolina, facilities.

151.    In each of these facilities the Relators experienced wrongful admission and retention of hospice patients. In Raleigh, North Carolina there were falsified

admission documents and wrongful admissions of home health care patients. The pressure to up code charges in Raleigh came from corporate offices. The bonus system paid to administrators to admit cases was also a corporate structure.

152.    The Plaintiff-Relators' combined complaints about such practices brought them into contact with corporate officials of Heartland and HCR ManorCare. While the corporate offices did react with some compliance training, the practices complained about continued. Furthermore, contact with other officials in the HCR ManorCare group confirmed additional sites pursued these practices.

153.    For example, Plaintiff-Relator Olexy had a phone discussion with a colleague who was the administrator at a Heartland hospice site in Miami, Florida. That administrator said that the Heartland people just wanted people to scribble anything to justify admittance.

154.    Susan Keitt, the Regional Director of Operations, told Plaintiff-Relator Olexy while she complained about Dr. Marsh's signing admission to home health care, that the Ohio home health care program also had the Hospice Director signing initial certifications to admit a patient for home health care. Plaintiff-Relator Olexy replied that Ohio was not in compliance either.

155.    When Plaintiff-Relator Olexy first complained about wrongful documentation of form 485 and face-to-face documents she got in trouble with corporate officials. In fact, Deb Arendale told her that she was making too much out of things during a meeting with five or six other administrators at the Toledo, Ohio HCR Manor Care corporate headquarters.

## VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT, THE NORTH CAROLINA FALSE CLAIMS ACT AND THE VIRGINIA FRAUD AGAINST THE TAXPAER ACT

### COUNT I

#### Violations of 31 U.S.C §§ 3729 (a)(1)(A) for submitting or causing the submission of false claims to the United States.

156. The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

157. This is a claim for treble damages and civil penalties under the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

158. As set forth above, Defendants knowingly presented, and or caused to be presented, fraudulent claims for payment or approval to the United States Government through actions in violation of law and CMS regulations.

159. These illegal practices include, but are not limited to charging for hospice care which was not medically necessary, charging for home health care which was not medically necessary, falsifying admissions for hospice and home health care, obtaining referrals for hospice care in exchange for providing kickbacks in the form of free labor, and extending and re-admitting patients for services when those services were not medically necessary.

160. To the best of the Plaintiff-Relators' knowledge, with the specific exception of the Raleigh, North Carolina Home Health Care admissions for Heartland (that service having been closed), all the practices described herein to defraud health care programs by the Defendants are ongoing and continuing.

161. As a result of Defendants continuing fraudulent and or illegal conduct the United States has directly or indirectly paid numerous false claims.

31

162.    Damages to the United States are ongoing and include, but are not limited to, the full amount it has paid as a result of Defendants' false claims and fraudulent conduct as well as additional costs for durable medical equipment and treatment related to wrongful admissions.

163.    Defendants are liable for three times the full amount of the damages to the United States in an amount to be determined at trial.

164.    Each and every such false claim is also subject to a Civil Fine of between Five Thousand Five Hundred and Eleven Thousand Dollars ($5,500 and $11,000) plus any increase as specified under the Federal Civil Penalties Adjustment Act of 1990 for each violation of 31 U.S.C. § 3729.

165.    Defendants are also liable for attorney's fees and expenses pursuant to 31 U.S.C. § 3730(d).

### COUNT II

**Violations of 31 U.S.C § 3729(a)(1)(B) for using false records or statements to get claims paid.**

166.    The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

167.    This is a claim for treble damages and civil penalties under the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

168.    As set forth above, Defendants made, and or caused to be made, false statements and submitted, and or caused to be submitted, false records to obtain payment through federal government healthcare programs including but not limited to Medicare, Tricare and Medicaid.

169.    Those false statements and records were material to the federal government's decision to pay money to the Defendants.

170.    Each and every false statement on a face-to-face admission form or admission form for hospice care was a material false statement made to obtain government funding.

171.    To the best of the Plaintiff-Relators' knowledge these practices by Defendants are ongoing and continuing.

172.    As a result of Defendants continuing fraudulent and or illegal conduct, the United States has directly or indirectly paid numerous false claims.

173.    Damages to the United States are continuing and ongoing and include the full amount it has paid on any such false claims.

174.    Defendants are liable to the United States for three times the full amount of those damages.

175.    Each and every such false statement is also subject to a civil fine of between Five Thousand Five Hundred and Eleven Thousand Dollars ($5,500 and $11,000) plus any increase as specified under the Federal Civil Penalties Adjustment Act of 1990.

176.    Defendants are also liable for attorney's fees and expenses pursuant to 31. U.S.C. § 3730(d).

## COUNT III

### Violations of the North Carolina False Claims Act N.C. Gen. Stat. §§1-605 *et seq.*

177.    The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

178.     This is an action for treble damages and civil fines under the North Carolina False Claims Act N.C. Gen. Stat. §§1-605 *et seq.*

179.     As set forth above, Defendants created false claims in violation of the North Carolina False Claims Act N.C. Gen. Stat. §1-607(a)(1) by knowingly charging for hospice care which was not medically necessary, charging for home health care which was not medically necessary, falsifying admissions for hospice and home health care, obtaining referrals for hospice care in exchange for providing kickbacks in the form of free labor, extending and re-admitting patients for services when those services were not medically necessary.

180.     In pursuing these false claims the Defendants also necessarily created false records and statements in violation of N.C. Gen. Stat. §1-607(a)(2).

181.     Damages to the State of North Carolina include the full amount of any such fraudulent claims it has paid as a result of Defendants' false claims and fraudulent conduct as well as additional costs for durable medical equipment and treatment related to wrongful admissions.

182.     Any such violations of the North Carolina False Claims Act subject Defendants to three times the full amount of damages sustained by the State of North Carolina in an amount to be determined at trial. Defendants are also liable for civil fines for each and every violation of the Act.

183.     Defendants are also liable for attorney's fees and expenses pursuant to N.C. Gen. Stat. § 1-610(d).

## COUNT IV

### Violations of the Virginia Fraud Against Taxpayers Act
### VA. Code Ann. §§8.01-216.1 *et seq.*

184.    This is an action for treble damages and civil fines under the Virginia Fraud Against Taxpayers Act VA. Code Ann. §§8.01-216.1 *et seq.*

185.    As set forth above, Defendants presented or caused to be presented false claims in violation of Virginia Fraud Against Taxpayers Act VA. Code Ann. § 8.01-216.3.A.1 through illegal actions including, but not but not limited to, knowingly charging for hospice care which was not medically necessary, charging for home health care which was not medically necessary, falsifying admissions for hospice and home health care, obtaining referrals for hospice care in exchange for providing kickbacks in the form of free labor, extending and re-admitting patients for services when those services were not medically necessary.

186.    In furtherance of their fraudulent actions the defendants also necessarily made and used false records and statements in violation of VA. Code Ann. §8.01-216.3.A.2.

187.    Damages to the Commonwealth of Virginia include the full amounts paid on any such fraudulent claims as well as any additional damages such as charges for durable medical equipment related to wrongful admissions.

188.    Any such violations of the Virginia Fraud Against Taxpayers Act and are subject Defendants to three times the full amount of damages sustained by the Commonwealth of Virginia in an amount to be determined at trial. Defendants are also liable for civil fines for each and every violation of the Act.

35

189.    Defendants are also liable for attorney's fees and expenses pursuant to VA. Code Ann. §§8.01-216.7.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Relators, on behalf of themselves, the United States, and all States listed herein request that judgment be entered in their favor and against Defendants as follows:

(a) That Defendants cease and desist from violating 31 U.S.C. § 3729, *et seq.*, and the counterpart provisions of the North Carolina False Claims Act N.C. Gen. Stat. §§1-605 *et seq.*, and the Virginia Fraud Against Taxpayers Act VA. Code Ann. §§8.01-216.1 *et seq.* as set forth above;

(b) That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States, North Carolina and Virginia has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $11,000 plus any increase as specified under the Federal Civil Penalties Adjustment Act of 1990 for each violation of 31 U.S.C. § 3729; plus the appropriate amount to North Carolina and Virginia for damages and civil fines as determined under the North Carolina False Claims Act and the Virginia Fraud Against Taxpayers Act;

(c) That Plaintiff-Relators be awarded an amount that the Court decides is reasonable, which shall not be less than 15% nor more than 30% of the proceeds or settlement of any related administrative, criminal, or civil actions, including the monetary value of any equitable relief, fines, restitution, or

disgorgement to the United States, North Carolina, Virginia and/or third parties;

(d) That Plaintiff-Relators be granted a trial by jury;

(e) That Plaintiff-Relators, the United States, North Carolina, and Virginia be awarded pre-judgment interest;

(f) That the Plaintiff-Relators be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. §§ 3730(d) and;

(g) The United States, the State of North Carolina, the Commonwealth of Virginia and the Plaintiff-Relators recover such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Respectfully submitted,

Peter Biberstein
Virginia Bar # 85162
Price Benowitz, LLP
409 7TH Street, N.W.
Washington, DC 20004
peter@pricebenowitz.com
Phone: 202-417-6000
Fax: 202-664-1331

Anthony C. Munter
Price Benowitz, LLP
409 7TH Street, N.W.
Washington, DC 20004
tony@pricebenowitz.com
Phone: 202-417-6000
Fax: 202-664-1331
*To be admitted Pro Hac Vice*

*Attorneys for the Plaintiff-Relators*